**Joyce I. CRAIN, Plaintiff,**

v.

**John S. CALLAHAN, Acting Commissioner, Social Security Administration, Defendant.**

**No. 96–6326–HO.**

United States District Court,
D. Oregon.

Dec. 18, 1997.

Ralph Wilborn, Eugene, OR, for Plaintiff.

Kristine Olson, William W. Youngman, Craig J. Casey, U.S. Atty's Office, Portland, OR, Richard Weymore, Lucille G. Meis, Office of General Counsel, Social Sec. Admin., Seattle, WA, for Defendant.

## ORDER

HOGAN, Chief Judge.

Plaintiff brought this proceeding pursuant to section 205(g) of the Social Security Act (the Act), as amended, 42 U.S.C. § 405(g), to

obtain judicial review of the Commissioner's final decision denying plaintiff's application for disability insurance benefits and Social Security Income benefits [# 1].

Plaintiff filed an application for disability insurance benefits and Social Security Income benefits on January 27, 1992, and March 17, 1992, respectively, alleging that she had been disabled since June 2, 1986 (Tr.114–117, 148–151). The application was denied on October 19, 1992 (Tr.137–140), and the request for reconsideration was denied on March 17, 1993 (Tr.146–147).

Plaintiff's request for a hearing was granted and a hearing was held before an administrative law judge (ALJ) on September 12, 1994, and continued on December 20, 1994, and August 8, 1995 (Tr.106–113, 66–105, 42–65). On December 11, 1995, the ALJ denied plaintiff's claim, finding she was not disabled because she retained sufficient residual functional capacity to perform past relevant work (Tr.15–29). The ALJ's decision became the final decision of the Commissioner when the Appeals Council declined review on November 12, 1996 (Tr.6–8). Plaintiff timely filed a complaint in this court on December 18, 1996 [# 1].

## I. FACTS

Plaintiff was born on March 26, 1940, and alleges a disability onset date of June 2, 1986. Plaintiff was 46 years of age at the alleged onset date and 54 and 55 years old at the time of the administrative hearings. She has a high school education and has completed a semester of college course work in medical terminology. Plaintiff has past relevant work experience as a secretary-bookkeeper and as supervisor in a hospital accounting office (Tr.59, 79–83, 183–184). She reported sustaining a number of injuries as a result of two automobile accidents and several falls.

Plaintiff bases her claim for disability upon degenerative disease of the spine, hip bursitis, urinary incontinence, carpal tunnel syndrome, depression anxiety, and a conversion disorder. She has not engaged in substantial gainful activity since June 2, 1986, her alleged onset date.

Plaintiff was last insured for Title II Social Security Disability benefits on December 31, 1987. Accordingly, to establish entitlement to Title II benefits, plaintiff must show she became disabled on or before that date. To establish that she is eligible for SSI benefits, she must show disability prior to the ALJ's decision in this matter.

### a. Medical Evidence:

Plaintiff's medical history is long and complicated. The court has attempted to cull the most relevant information from the extensive record in this case.

In 1977, plaintiff was referred to an orthopedist, William C. Robertson, M.D. Dr. Robertson reviewed the claimant's medical history in connection with a 1975 automobile accident. He noted plaintiff complained of pain on stooping, bending and prolonged standing. Dr. Robertson treated carpel tunnel in plaintiff's wrist. This was the only positive neurological difficulty. Dr. Robertson stated, "I feel that her emotional difficulty and exaggerated symptoms ... constitute conversion reaction." (Tr.266).

According to a workers' compensation summary, plaintiff initially injured her lower back on March 12, 1979, when she tripped over a file cabinet while working at the Eugene Hospital and Clinic as a financial counselor (Tr.221). Her treating physician, Dr. Richard Matteri, diagnosed a "localized spinal stenosis, L4–5, with protruding L4–5 disc and generalized L5 root pressure." (Tr.221). The doctor also noted that plaintiff "does have some psychological problems, which are contributing to her overall inability to function." (Tr. 222). Plaintiff was also evaluated by Dr. James Newman, a psychiatrist, who diagnosed plaintiff as "suffering from conversion symptoms of a hysterical nature." (Tr. 223).

In January, 1980, Dr. Matteri referred plaintiff to Ronald J. Lechnyr, Ph.D., a psychiatric social worker with a doctorate in social work, for an evaluation and pain control treatment (Tr.223). After meeting with plaintiff on April 8, 1980, Dr. Lechnyr opined that plaintiff possessed "some conversion symptoms, hysterical personality traits," and real organic pain (Tr.244). On this same

date, Dr. Matteri wrote: "It is blatantly obvious at this point in time that the patient is not going to make it back to any form of gainful employment. I think her psychological outlook, as well as her physical condition is prohibitive.... She has a definite disability." (Tr.245).

After conducting a four to five day evaluation, Dr. George W. Knox, M.D., a neurologist, noted plaintiff's considerable history of neck and back trauma and that plaintiff "has clinical evidence for a probable chronic thoracolumbar paravertebral muscle strain as the result of trauma as well as a poorly documented traumatic disc. I strongly suspect there is a considerable amount of conversion phenomena associated with depression and anxiety complicating the patient's current problems."

Dr. Charles E. Holland, M.D., a psychiatrist, examined plaintiff on June 26, 1981, and prepared a report in which he summarized plaintiff's medical history. Dr. Holland discounted the views of Dr. Lechnyr, noting that he was not a medical doctor and was therefore not a medical expert. After making repeated references to plaintiff's conversion disorder, Dr. Holland diagnosed plaintiff as having conversion disorder accompanied by brief "pseudo-depressions," evidenced in plaintiff's medical history as early as 1966. His Axis II diagnosis was dependent personality disorder and his Axis III diagnosis was "chronic lumbosacral strain." (Tr.279). Although agreeing plaintiff possessed a "functional problem," Dr. Holland cited Drs. Knox and Matteri in concluding "that this lady has no demonstrable organic pathology that can be corrected. Perpetuation of her disability is entirely psychiatric or psychological...." (Tr.280).

On June 12, 1984, Dr. Franklin Wong of Sacred Heart Injured Workers' Program examined plaintiff and reviewed her medical history. Dr. Wong concluded plaintiff suffered from chronic lower back pain syndrome, conversion disorder and dependent personality disorder. Dr. Wong also observed that plaintiff "was unable to maintain a static position for more than 2–3 minutes." (Tr.210–211).

On June 21, 1984, Robert Kurlycheck, Ph. D., examined plaintiff and observed that plaintiff's test results suggest:

a strong focus on physical complaints and somatic concerns. This is not an unusual profile to see in an individual who has long-term pain complaints. Many of these individuals have become sensitized to pain and discomfort. They have a high pain-fear level and become very cautious of being re-injured. There may be a tendency to avoid "dangerous" situations and a tendency to over-react to physical pain. These patients ... have a lot of complaints which are not able to be totally explained by medical data.

(Tr.202–204).

On June 11, 1986, Dr. Peter Tynberg noted plaintiff's history of stress incontinence and concluded plaintiff may be suffering from "atonicity of the bladder with a lower motor neuron neogenic bladder." (Tr.548).

In June, 1986, plaintiff was examined by several specialists at Eisenhower Memorial Hospital in Palm Springs, California, including Dr. Robert Murphy, Dr. Joel Hirshberg, Dr. Isaac Sultan, and Dr. Ali Tahmouresie. On June 12, 1986, Dr. Murphy stated that despite "suggestion of disc bulging at C5–6 and C6–7, that would affect the C6 and C7 nerve rootlets," he did not believe there was a surgically treatable lesion in the cervical spine. (Tr.544). Instead, Dr. Murphy opined that plaintiff's problems were largely non-anatomical and noted "considerable supratentorial overlay," overlay originating in the brain. (Tr.544).

Dr. Hirshberg examined plaintiff on June 16, 1986, and noted that plaintiff "will require chronic pain management which may be organized by a psychiatrist." (Tr.541). Dr. Hirshberg noted that plaintiff appeared to have some secondary gain from the evaluation process. (Tr.541).

On June 17, 1986, Dr. Sultan concluded plaintiff suffered from hysterical conversion reaction although he noted that it was his impression that plaintiff had an acute herniated cervical disk involving the C6 nerve root. (Tr.535–536). Dr. Sultan stated:

It is my opinion that the patient does have hysterical conversion reaction. This also confirms Dr. Robert Murphy who felt this to be the case as well. In inserting the needle electrode, however, in the spine, the lumbar spine revealed acute denervation of mild to moderate degree. The patient has bulging disks in the lumbar spine and I feel that this is accounting for the EMG abnormalities in this region. The needle electrode was also inserted in the cervical spine and there [were] some mild acute changes, but nothing very marked. In summary, therefore, it is my opinion that the patient does have marked emotional overlay with hysteria, but she also has real underlying degenerative spine disease on the basis of her severe obesity and confirmatory myelographic and CT scan picture.

(Tr.536). Dr. Sultan discussed the case with Dr. Tahmouresie and both noted they were in agreement with the reports of Dr. Murphy.

Plaintiff was examined again on August 11, 1986, for finger pain and numbness. She also reported experiencing problems with bladder weakness. (Tr.313). The examining doctor (signature illegible) noted "a significant amount of functional overlay" and recommended a psychiatric evaluation. (Tr. 315).

On December 17, 1986, Dr. A.E. Oygar observed that plaintiff's "MRI of the lumbar spine reveals disk degeneration at L4–5, and bulging is seen at L3–4, L4–5, and L5–S1.... The patient's cervical spine shows abnormality at C4–5, with greater abnormality at C5–6. There is a possibility of a free disk fragment at this level." Seeing plaintiff again on December 19, 1986, Dr. Oygar noted that she complained of stress incontinence for which she had been taking Urochron. (Tr.510). A cervical myelogram showed "[s]mall anterior extradural defects at L4–5 and L5–S1" and slight disk space narrowing at L4–5. (Tr.565).

A radiographic examination performed by Dr. John Phelan on April 19, 1988, revealed bursitic calcification in plaintiff's right hip along with mild degenerative changes. (Tr. 354).

On August 14, 1989, Dr. Donald Smith examined plaintiff and described ongoing "neck-shoulder-arm pain radiating deep into the right leg, foot, and heel." (Tr.365). Dr. Smith noted that plaintiff "does undoubtedly have evidence of a spondylosis at L3–4 and L4–5 and particularly the latter may well be symptomatic." (Tr.375). Dr. Smith also noted that plaintiff's "bladder has continued to give her a great deal of distress, and she is constantly taking antibiotics and diarretics [sic]. She suffers from water retention, infection, incontinence and this is particularly worsened when she has severe pain." (Tr. 365).

Dr. Murray Taylor examined plaintiff on numerous occasions from 1987 through 1989. He noted plaintiff's difficulty with bladder control. (Tr.399). Dr. Taylor concluded plaintiff was suffering from chronic pain syndrome as well as chronic cervical and lumbar radiculopathy. (Tr.389–405).

On April 29, 1988, Dr. Russell Keizer examined plaintiff. Dr. Keizer diagnosed lumbar and cervical spine pain syndromes and noted plaintiff's difficulty with bladder control. (Tr.379, 369). This same month, x-rays showed some degenerative changes and bursitic calcification in plaintiff's right hip. (Tr. 354).

A lumbar MRI report dated July 20, 1989, indicates "[m]ild to moderate disc bulging 4–5. Mild disc bulging at 3–4 and 5–1 with borderline spinal stenosis at 3–4 and 4–5." (Tr.376). Nerve conduction studies performed July 13, 1989, note "moderate denervation in the segmental distribution of L5, S1, most compatible with a lumbosacral radiculopathy." (Tr.378).

On June 4, 1990, plaintiff was examined by Dr. William Peacher who concluded plaintiff's hypesthesia and other symptoms "may well represent a residual conversion reaction." (Tr.613). Dr. Peacher found plaintiff to have lost approximately twenty-five percent of her pre–1979 capacity for activities such as repetitive bending, stooping, lifting, pushing, pulling, climbing or other activities involving similar effort. He found plaintiff to be precluded from very heavy work. (Tr.614).

On July 17, 1990, Dr. Edmund Chein conducted a comprehensive physical examination. Dr. Chein reported that infrared thermographic evaluation was abnormal and "consistent with bilateral median nerve irritation at the wrists and right C5–6 nerve irritation [and] right L5 lumbar nerve irritation." (Tr.621). Dr. Chein diagnosed chronic cervical/lumbar sprain/strain, cervical/lumbar spondylosis, right C5–6 radiculopathy, right L5 radiculopathy, bulging lumbar discs at L3–4 and L4–5, bulging at the C5–6 cervical disc, a history of degenerative joint disease in the right hip, bilateral carpel tunnel syndrome, and a "history or conversion reaction with ongoing prominent emotional overlay." (Tr.627–628). Based on the above diagnoses, Dr. Chein concluded plaintiff had been "temporarily totally disabled since June 3, 1986." (Tr.627). Dr. Chein further concluded: "Based on the combination of the patient's orthopedic disabilities, her age and significant emotional overlay, it is my opinion she is for all practical purposes permanently totally disabled from any reasonable suitable gainful employment." (Tr.628).

On March 6, 1992, Dr. Richard Rappaport, a forensic psychiatrist, examined plaintiff. Dr. Rappaport diagnosed Dysthymia, a mild form of depression. (Tr.640). Dr. Rappaport concluded: "This patient has been temporarily totally disabled as a result of her physical and emotional symptoms between the time she was hospitalized on June 3, 1986 until 1990, at which time she became permanent and stationary." (Tr.641).

On September 22, 1992, plaintiff was examined by Dr. Scott Bergman. Dr. Bergman diagnosed chronic neck and low back pain. Dr. Bergman also noted that plaintiff "has had bladder problems and at times will be incontinent." (Tr.672).

On February 20, 1995, Dr. William Jones, Ph.D., performed a psychological evaluation. A psychological profile indicated marked depression, anxiety, and a "tendency to obsessively focus on her physical health and well being." (Tr.699). Dr. Jones diagnosed major depression, single episode, severe, and opined that plaintiff suffered from a "[s]erious impairment in affect, and in the occupational setting." (Tr.699–700). Dr. Jones noted that plaintiff was markedly limited in her ability to complete the normal workday without interruptions from physically based symptoms and in her ability to perform work at a consistent pace without an unreasonable number of rest periods. (Tr.701–702). Dr. Jones suggested that plaintiff's condition met the requirements of 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.04. (Tr. 705–712).

On May 16, 1995, plaintiff was seen at the Eugene Clinic for rectal and vaginal bleeding, which plaintiff asserted had been reoccurring since November, 1993, when she reports being involved in an automobile accident. Although the record does not contain records documenting this, plaintiff reports she underwent bilateral knee surgery after this motor vehicle accident. (Tr. 734).

**b. Hearing Testimony:**

Three hearings were held in plaintiff's case. Plaintiff testified that she has rectal and urinary tract bleeding two to three times a week, which is accompanied by intermittent cramping that lasts eight to thirteen hours. (Tr.48–52). These cramps cause her to double up in pain and are so severe that she cannot maintain a telephone conversation. (Tr.52–53). She testified that she experiences urinary incontinence on a daily basis. (Tr.50).

The ALJ discredited the testimony of one medical expert during the hearing process. Dr. Maurice Gore appeared at the second hearing as a medical expert and, based on his review of the medical evidence in the record, testified extensively about plaintiff's physical impairments. Dr. Gore concluded plaintiff's spinal impairment meets the criteria of 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 1.05C.

Apparently due to the medical expert's failure to distinguish between original sources and extracts in the record, the ALJ stated: "Counselor, I concluded while listening to the Doctor's testimony that I'm not really going to get too much out of it. I'm not going to strike it out.... I think what I'm going to need to do probably is ...

reconvene and give this record to another doctor and ask him to go back and look it over." (Tr.102). Despite this statement, no medical expert was called to testify at the third and final hearing.

Mr. Joe Brown testified as a vocational expert (VE) (Tr.56–64). The ALJ proposed the following hypothetical to the VE:

[A]ssume we have an individual the same age, education, and prior work experience as Ms. Crain. I'd like you to assume that she could sit for six hours out of an eight-hour day, stand or walk six hours out of an eight-hour day, lift 10 pounds on a frequent basis, 20 pounds on an occasional basis. I'd like you to further assume that she could not do any repetitive extending of the neck and that there would be a 20 percent limitation in the lateral rotation of the neck which ... would not be vocationally relevant except that it would probably exclude perhaps certain driving jobs or ... any other jobs that would involve frequent neck rotation. I'd like you to further assume that she had, during this period, some depressive condition but which would not preclude detail tasks [but] the individual would have more difficulty with simple, repetitive tasks. That is, that the mind would wander and what not. The lady's education and intelligence would be such that she would be better equipped to keep her mind on more detailed tasks than simple, repetitive tasks.

(Tr.59–60).

The VE testified that plaintiff, under the above hypothetical, could return to her past employment as a secretary bookkeeper or work in a hospital accounting office. (Tr.60).

The ALJ then altered the hypothetical by asking the VE to assume the individual would also experience urinary incontinence and cramping one to two times per week that would require her to stop work to change her clothes. The cramping would divert her attention for a minute or two and would continue for every ten or fifteen minutes for a period of two to three hours. The VE responded that such a person would be precluded from performing plaintiff's prior relevant work or any other work. (Tr.62–63).

Finally the ALJ modified the first hypothetical in the following manner:

I'd like you to assume the individual had ... a marked impairment in her ability to maintain attention and concentration for extended periods of time. A marked impairment in her ability to complete a normal work week without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. A marked impairment in her ability to accept instructions and respond appropriately to criticism from her supervisors. And a marked impairment in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

(Tr.63).

The VE testified that a person with the above restrictions would be unable to perform plaintiff's past relevant work. (Tr.63). The VE further testified that plaintiff would be unable to perform her past relevant work if she is unable to do a full range of sedentary activity. (Tr.64).

### c. ALJ's Findings and Conclusion:

The ALJ determined plaintiff had not engaged in substantial gainful employment since the alleged onset date and that she suffered from severe impairments consisting of degenerative disease of the spine, dysthymia, and conversion disorder. (Tr.20). However, the ALJ concluded there were no medical findings that met or equaled the listing requirements of any impairment found in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr.21).

The ALJ determined plaintiff retained a residual functional capacity to: 1) sit for at least six hours in an eight hour day; 2) lift ten pounds frequently and twenty pounds occasionally; 3) perform only limited lateral rotation of her neck but do repetitive neck extensions; 4) engage in activities of daily living, only moderately restricted by her mental impairments; and, 5) maintain social functioning, concentration, persistence and pace, only slightly limited by her mental impairment. (Tr.21). The ALJ found plaintiff had a residual functional capacity to per-

form her past work in a hospital accounting office or as a secretary/bookkeeper. (Tr.28).

After reviewing the medical evidence of record, the ALJ specifically rejected as not credible Dr. Jones' conclusion that plaintiff was suffering from major depression. (Tr.25).

> The claimant may or may not be suffering from significant depression, but the record as a whole does not support a diagnosis of depression so severe that it meets a listing. . . . She has been seen by at least four psychiatrists and only one diagnosed a depressive condition, and that was slight to moderate dysthymia in 1992. . . . Dr. Jones was hired by the claimant's attorney for the express purpose of providing a report on the claimant's Social Security disability status and Dr. Jones was apparently unfamiliar with the claimant's history except as related by the claimant. Accordingly, Dr. Jones' opinions that the claimant meets or equals listings are not found fully credible. It is also noted that, even if Dr. Jones' opinions were accepted as correct at the time of the examination, there is nothing therein to indicate that symptoms of such severity were present months or years before the examination. In short, there is no evidence that the claimant met the durational requirement. Dr. Jones' opinions are given weight as discussed below, but for all of the above reasons his opinions were assigned less probative value than the rest of the psychological and psychiatric evidence of record.

(Tr.25–26).

The ALJ also found plaintiff's subjective statements regarding pain were not credible, noting that "the preponderance of evidence shows that there is and has been very little physically wrong with the claimant since 1979. . . ." (Tr.27). He noted that plaintiff had pursued a number of legal claims based on questionable physical symptoms. The ALJ pointed out that the medical record does not specifically document the level of pain alleged by plaintiff and contains only one documented instance of urinary incontinence. (Tr.26–27). He noted that many of the doctors examining plaintiff have reported the presence of "significant functional overlay,

symptoms with no detectible organic cause." (Tr.27). "Other doctors have been less delicate and openly accused her of exaggerating her symptoms for secondary gain." (Tr.27). The ALJ concluded:

> When a patient endorses numerous physical symptoms for which no etiology is found the most reasonable alternatives to consider are: (1) The claimant has a medical condition which cannot yet be diagnosed; or (2) The claimant has a somatoform disorder; or (3) The claimant is malingering. The salient feature of a somatoform disorder which distinguishes it from malingering is that the physical symptoms are not intentionally feigned. (Diagnostic and Statistical Manual—IV). I have carefully considered all three possibilities in this record and concluded from the preponderance of the evidence that the claimant is malingering. Her alleged symptoms have been tested and retested with almost totally negative results. No doctor has opined that he or she believes the claimant has an undiagnosed medical condition. While the claimant may have some sort of underlying somatoform disorder, she has gone well beyond merely maintaining an unreasonable belief that she has certain severe conditions. The record indicates that the claimant has chronically malingered. She has abruptly changed her story at several junctures in the record. She has manufactured histories of symptoms and of treatment. There are several indications that she has consciously faked symptoms or masked true responses to try to fool examiners. She has grossly exaggerated her symptoms where there was substantial secondary gain.

(Tr.27–28).

## II. STANDARD OF REVIEW

This court must affirm the ALJ's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Drouin v. Sullivan,* 966 F.2d 1255, 1257 (9th Cir.1992). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It is

more than a scintilla but less than a preponderance. *Smolen v. Chater,* 80 F.3d 1273, 1279 (9th Cir.1996) (citing *Sorenson v. Weinberger,* 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975)).

The burden of proof rests on the claimant to establish entitlement to disability benefits. *Rhinehart v. Finch,* 438 F.2d 920, 921 (9th Cir.1971). To meet this burden, a claimant must establish "an inability to engage in any substantial gainful activity by reason of any medically determined physical or mental impairment which can be expected ... to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

## III. DISCUSSION

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1502, 416.920. First, the Commissioner determines whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, if the claimant is not so engaged, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. Next, the Commissioner determines whether the impairment meets or equals one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful employment. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed to be disabled; if not, the Commissioner proceeds to step four to determine whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If so, the claimant is not disabled. If not, the burden shifts to the Commissioner, in step five, to establish that the claimant can perform other work. *Bowen,* 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).

Steps one through three are not at issue here. The ALJ concluded his inquiry at step four, at which stage he determined plaintiff could perform her past relevant work. To reach this conclusion, the ALJ rejected significant medical evidence from treating, examining and testifying medical sources. The ALJ also rejected plaintiff's testimony, finding that she had malingered.

Plaintiff argues the decision of the ALJ is not supported by substantial evidence and was reached using improper legal standards. Plaintiff asserts the ALJ erred in concluding plaintiff had malingered, rejecting plaintiff's testimony, and in rejecting certain medical evidence. Plaintiff requests that this court remand for payment of benefits.

### 1. ALJ's Malingerer Determination:

Plaintiff objects to the ALJ's determination that she is a malingerer. Plaintiff argues the record does not support this conclusion, which plaintiff asserts the ALJ reached through an erroneous interpretation of physicians' terminology regarding plaintiff's conversion disorder.

The dozens of doctors who have examined plaintiff have taken inconsistent views regarding whether she suffered from any significant physical ailment. With regard to her mental impairment, however, the record contains substantial and largely uncontradicted evidence that plaintiff suffers from what is known as conversion disorder or hysterical conversion reaction.[1] Moreover, the record does not contain an allegation by any of these same doctors that plaintiff is a malingerer or suspected of being such. The ALJ cites physicians' statements that he argues indirectly suggest plaintiff is a malingerer.

As evidence that plaintiff has intentionally feigned symptoms, the ALJ points primarily

---

**1.** "Such a condition is characterized by emotional distress and anxiety. The patient unconsciously produces physical symptoms to meet his psychological problem.... Since the physical symptoms are unconsciously produced, the patient himself sees no relation between his symptoms and the stress situation. This lack of intent to deceive distinguishes the conversion reaction from malingering, where the symptoms are consciously produced with intent to deceive." *Hassler v. Weinberger,* 502 F.2d 172, 176 n. 3 (7th Cir.1974).

to notations by physicians that plaintiff appeared to derive some "secondary gain" from the evaluation process or that plaintiff's symptoms have a "functional overlay." (Tr.27). Plaintiff argues these references, rather than proof of malingering, are consistent with a description of a person suffering from conversion disorder. Plaintiff asserts that these terms are often used to denote fulfillment of the psychological need of persons with conversion disorder. In other words, the secondary gain is the psychological gain a person with this disorder derives from suffering the symptoms of an impairment, regardless of the true presence of that impairment. None of the physicians or psychiatrists documented in the record questioned the legitimacy of this mental impairment.

Based on the court's review of the record, the above references to secondary gain and functional overlay reveal the physicians' skepticism regarding the presence of an underlying physical impairment. They do not necessarily indicate malingering or overturn the conversion disorder diagnosis agreed upon by nearly every doctor who examined plaintiff.

Generally, the court is not persuaded that the record supports a finding of malingering. This conclusion is not dispositive, but rather relates to the burden the ALJ must satisfy in rejecting plaintiff's testimony.

### 2. Rejection of Plaintiff's Testimony:

■ Plaintiff asserts the ALJ's rejection of her testimony was not based on specific findings stating clear and convincing reasons. In this circuit, once a claimant produces objective medical evidence of an underlying impairment which could reasonably be expected to produce pain or other subjective symptoms, and if there is no affirmative evidence that claimant is malingering, then the ALJ "may reject the claimant's testimony regarding the severity of [her] symptoms only if he makes specific findings stating clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1284 (citing *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir.1993)).

The court in *Smolen* stated:

The claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.

. . . . .

Finally, the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.... This approach reflects the highly subjective and idiosyncratic nature of pain and other such symptoms.

*Id.* at 1282.

■ Plaintiff has produced sufficient evidence of an underlying impairment, both mental and physical. Plaintiff has also shown that the combination of impairments could reasonably be expected to produce some degree of symptom. The above evidence, particularly that related to her mental impairment and bladder difficulties, demonstrates the presence of medically determinable impairments that could reasonably be expected to cause some degree of symptom.

■ Once this showing has been made, the ALJ may reject the plaintiff's testimony only if he makes specific findings that state clear and convincing reasons for doing so. *Id.* at 1283. While the ALJ directly questioned plaintiff's credibility (Tr.26), he refers to little credible evidence of malingering. The court finds the analysis provided by the ALJ falls short of that required in this circuit. The ALJ recites plaintiff's history of filing a number of legal claims over a thirty-four year period. He states these claims were based on "unconvincing symptoms" and argues the notes of the physicians "offer no corroboration of the duration, frequency or intensity of pain." (Tr.26).

The ALJ also states that he "could find only one entry in this record of any documented urinary incontinence...." (Tr.26–27). The court found dozens of references in the record to plaintiff's problems with urinary

incontinence. (*See, e.g.,* Tr.305–06, 313, 365, 548, 555). It is true that few of these references reflect "documented" instances of incontinence in the sense that the episode occurred in the presence of medical personnel. However, the court declines to disregard them, as the ALJ did, as evidence of the existence of urinary incontinence. These references, undocumented as they are, indicate that plaintiff complained of, sought treatment for, and was prescribed medication for urinary incontinence. These occurrences took place over a lengthy period of time that correlates to her request for benefits in this case. Moreover, the fact that these references are not documented does not constitute clear and convincing reason supporting the ALJ's rejection of plaintiff's testimony regarding her incontinence or any other part of her testimony.

The ALJ also cites the absence of a record of continuing treatment, noting that plaintiff was not taking any prescription pain medication for several years. (Tr.27). The ALJ acknowledges that plaintiff "has recently been prescribed medications," although he notes that these doctors appear to be unfamiliar with plaintiff's medical history. (Tr.27).

■ The ALJ has failed to provide clear and convincing reasons for rejecting plaintiff's testimony. The law of this circuit requires that we credit such improperly rejected testimony as a matter of law. *Lester v. Chater,* 81 F.3d 821 (9th Cir.1995). The vocational expert testified that a claimant suffering from urinary incontinence and associated cramps as described by plaintiff in her testimony would be unable to work at plaintiff's former work. Thus, if plaintiff's testimony is credited as a matter of law, disability is established.

**3. Rejection of Examining Physicians' Opinion:**

Plaintiff also asserts the ALJ improperly rejected the opinions of two examining physicians, Dr. Chein and Dr. Rappaport. Dr. Chein concluded plaintiff had been "temporarily totally disabled since June 3, 1986." He also stated, "[b]ased on the combination of the patient's orthopedic disabilities, her

age and significant emotional overlay, it is my opinion she is for all practical purposes permanently totally disabled from any reasonable suitable gainful employment." (Tr. 628). Similarly, Dr. Rappaport concluded: "This patient has been temporarily totally disabled as a result of her physical and emotional symptoms between the time she was hospitalized on June 3, 1986 until 1990, at which time she became permanent and stationary." (Tr.641).

■ The opinion of an examining doctor, when contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Lester,* 81 F.3d at 830–31. Here, the ALJ failed to provide any specific reasons for rejecting the opinions of these examining doctors. This failure is reversible error and the decisions of this circuit require that we credit such improperly rejected testimony as a matter of law. *Id.* at 834 ("where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion 'as a matter of law' ").

This testimony, if taken as true, serves to establish plaintiff's disability. Because the evidence, when given the effect required by the law of this circuit, establishes that plaintiff is disabled, the court remands for the payment of benefits.

## IV. CONCLUSION

The decision of the Commissioner is hereby reversed and this case is remanded for payment of benefits.