Cheryl L. BUKTA, Plaintiff,

v.

J.C. PENNEY COMPANY, INC.,
et al., Defendants.

No. 4:02 CV 598.

United States District Court,
N.D. Ohio.

Dec. 22, 2004.

Paul L. Bittner, Schottenstein, Zox & Dunn, Columbus, OH, Patrick A. Devine, Jennifer L. Fewell, Schottenstein, Zox & Dunn, Columbus, OH, David S. Timms, Mason Law Firm, Dublin, OH, for J.C. Penney Company, Inc., Benjamin Wenowitz, Donald McCormick, James Conrad, # 11–15 John Does, Kenneth Karbowski, Robert Karlowicz, Wayne Rustin, Defendants.

Martin J. Boetcher, Harrington, Matthew D. Gurbach, Harrington, Hoppe & Mitchell, Youngstown, OH, for Cheryl Bukta, Plaintiff.

Virginia Egan Fisher, Attorney General Office, Workers' Compensation Section, Cleveland, OH, for James Conrad, Defendant.

Ned C. Gold, Jr., Harrington, Hoppe & Mitchell, Warren, OH, for Anthony Bukta, Cheryl Bukta, Plaintiffs.

Nicholas A. O'Kelly, J.C. Penney Company, Plano, TX, for J.C. Penney Company, Inc., Defendant.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon Defendants' Motion for Summary Judgment. (Dkt.# 69).

## I. FACTUAL HISTORY

Defendant, JC Penney Company, Inc. ("JC Penney"), employed Plaintiff, Cheryl L. Bukta ("Bukta"), in various management positions from October 1973 to October 2001. (Dkt. # 74, Deposition of Cheryl Bukta ("Bukta Dep.") at 16; Dkt. # 99, Deposition Exhibits In Support of Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Exhibits") at exhibit 29). From 1980 to 2000 Bukta held the position of Senior Department Manager ("SDM") for the men's department at the Niles, Ohio JC Penney store. (Bukta Dep. at 31–32). The SDM position was a full time position requiring a minimum of 40 to 44 hours of work per week. (Bukta Dep. at 34).

On January 18, 2000, Benjamin Wenowitz ("Wenowitz"), the store manager and Bukta's supervisor, berated Bukta in front of a number of employees, customers and suppliers for leaving clearance racks of clothing in the aisles of the men's department. (Bukta Dep. at 79). This incident purportedly caused Bukta to suffer severe headaches, blurred vision, shortness of breath and chest pain. (Bukta Dep. at 96–97). As a result of these symptoms Bukta visited Dr. Hugh Shearer, her general practitioner, on January 20, 2000. (Bukta Dep. at 96). Dr. Shearer was unable to diagnose her condition, but did insist that she refrain from working. (Bukta Dep. at 96–98). Bukta subsequently requested a six week medical leave lasting from January 26, 2000 until March 13, 2000. (Bukta Dep. at 118–19). JC Penney approved the request and authorized Bukta to receive Illness Recovery Time ("IRT") Plan bene-fits during the leave period. (Plaintiff's Exhibits at exhibit 72).

Doctor Shearer eventually diagnosed Bukta as suffering from conversion disorder. (Dkt. # 95, Affidavit of Dr. Hugh Shearer ("Shearer Affidavit") at 2, ¶ 5). Conversion disorder is "chronic psychiatric disability" arising from seriously insulting and humiliating situations which can cause debilitating physical symptoms, panic attacks and anxiety.[1] (Dkt. # 94, Affidavit of Dr. Suzanne R. Lucot ("Lucot Affidavit") at ¶ 5; Shearer Affidavit at ¶ 4). A single traumatic incident can give rise to severe and chronic anxieties as well as panic attacks in those that suffer from conversion disorder. (Shearer Affidavit at ¶ 4).

Dr. Shearer, after considering Bukta's condition, concluded that a sudden return to a full time work schedule was an anxiety producing factor for Bukta; therefore, he recommended that Bukta, as part of her course of treatment, make a gradual return to work. (Plaintiff's Exhibits at exhibit 87, p. 2; Shearer Affidavit at ¶ 8). Bukta returned to work on March 13, 2000, and Dr. Shearer restricted her to a maximum of 20 hours per week. (Bukta Dep. at 119).

JC Penney attempted to honor Plaintiff's medical restriction and kept her on a four hours per day schedule with no evening hours. (Bukta Dep. at 121). JC Penney compensated Bukta for the four hours that she worked each day and also compensated Bukta with IRT Plan benefits for the remaining four hours of the average workday. (Plaintiff's Exhibits at

---

1. The American Psychiatric Association recognizes conversion disorder as a mental disorder. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV ("DSM–IV"), Somatoform Disorders, 300.11 (2002). "Conversion disorder involves unex-plained symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition. Psychological factors are judged to be associated with the symptoms or deficits." *Id.*

exhibit 72). JC Penney did not, however, relieve Bukta of her full time responsibilities. (Dkt. # 11, Affidavit of Cheryl Bukta ("Bukta Affidavit") at ¶ 45).

From March 13 through September 1 of 2000, Bukta continued working four hours per day. (Bukta Dep. at 121). In July, JC Penney's management, noting that Bukta was unable to complete all of her responsibilities while working a part time schedule, relieved Bukta of several of her responsibilities. (Dkt. # 104, Deposition of Benjamin Wenowitz ("Wenowitz Dep.") at 157, 165). The stated purpose of the decision was to assist Bukta in managing her duties and to facilitate her return to a full time schedule. (Wenowitz Dep. at 157, 165). Meanwhile, Bukta's condition began to improve considerably. (Shearer Affidavit at ¶ 10). On July 18, 2000, Dr. Shearer informed JC Penney that Bukta should continue on a part time schedule and estimated she could resume a full time schedule by October 18, 2000. (Plaintiff's Exhibits at exhibits 5 and 6).

In August of 2000, JC Penney managers Wenowitz, Kenneth Karbowski ("Karbowski"), Wayne Rustin ("Rustin") and Donald McCormick ("McCormick") discussed removing Bukta from the part time schedule, placing her on leave, and returning her to work when she was capable of working full time. (Wenowitz Dep. at 161, 330; Dkt. # 106, Deposition of Kenneth P. Karbowski ("Karbowski Dep.") at 48). The managers reasoned that because Bukta was limited to working four hours per day, JC Penney had to rearrange work schedules, forcing other sales associates to change their work and personal schedules and to assume increased night and weekend hours. (Wenowitz Dep. at 263–64). In-

deed, the managers discussed that at least three associates had been stepping in to help fulfill Bukta's full time duties. (Wenowitz Dep. at 312). They reasoned that JC Penney required a full time employee who could provide continuous leadership to associates. (Dkt. # 71, Filing Exhibits Referenced In Defendants' Motion for Summary Judgment, Wenowitz Deposition Exhibit 40 ("Bukta Memorandum")). The managers decided that JC Penney required a full time person in Bukta's position, especially for the upcoming holiday season. (Wenowitz Dep. at 160).

On September 1, 2000,[2] Bukta met with Wenowitz and Karbowski who explained that there would be no further part time work available to her and advised that Bukta must be able to return full time without restrictions. (Bukta Dep. at 151). They further advised that Bukta would be on a leave of absence until November 1, 2000. (Bukta Dep. at 152). On September 10, 2000, JC Penney placed Bukta on unpaid leave for a period not to exceed one year. (Plaintiff's Exhibits at exhibit 72).

The meeting upset Bukta, causing an aggravation of her symptoms. (Shearer Affidavit at ¶ 13). Following a consultation, Dr. Shearer sent a note, dated September 11, 2000, informing JC Penney that if placed on a work schedule of four hours a day, Bukta could expect a return to full time work before November 1, 2000. (Plaintiff's Exhibits at exhibit 5; Wenowitz Dep. at 173).

Bukta's expected return date—November 1, 2000—passed with Bukta remaining on medical leave. JC Penney did not, however, place a full time person in Bukta's position. (Wenowitz Dep. at 208, 214–16).

---

2. The managers originally scheduled a meeting for October 18, 2000. (Plaintiff's Exhibits at exhibit 7; Wenowitz Dep. at 207). The managers then, due to concerns regarding the workload during the approaching holiday season, rescheduled the meeting and met with Bukta on September 1, 2000. (Wenowitz Dep. at 207–08).

On January 5, 2001, Bukta sent JC Penney a note explaining that she would return to work full time on January 8 and attached releases from her psychiatrist, Dr. Susan Lucot, and her treating physician, Dr. Shearer, clearing her for an "attempt" to return to a full time schedule. (Plaintiff's Exhibits at exhibit 17). On January 8, Bukta worked for 30 minutes, but was told by Karbowski and Wenowitz to return home because she had not presented an unequivocal medical release to return to full time employment. (Bukta Dep. at 152–53; Wenowitz Dep. at 226–27).

In February 2001, JC Penney placed employee Karen King in Bukta's position. (Wenowitz Dep. at 215, 312–13). Karbowski sent a letter to Bukta, dated February 13, 2001, informing her that she had been replaced. (Bukta Affidavit at ¶ 91).

Thereafter, on February 14, 2001, Bukta's treating psychiatrist, Dr. Lucot, sent a letter to JC Penney rescinding all recommendations regarding a gradual return to work and clearing Bukta to return to work on a full time basis. (Plaintiff's Exhibits at exhibit 26). Two days later, Dr. Shearer sent JC Penney a letter emphasizing that the best treatment for Bukta would be a gradual return to work, but he released Bukta to work full time because it was the only option presented by JC Penney. (Plaintiff's Exhibits at exhibit 81). JC Penney interpreted the language of these letters as constituting an equivocal release. (Plaintiff's Exhibits at exhibit 88). Consequently, Bukta remained on unpaid leave. On or about March 26, 2001, Bukta filed an administrative charge with the Federal Equal Employment Opportunity Commission ("EEOC"). (Dkt. # 1, Attachment # 4 ("First Amended Complaint") ¶ 35). Meanwhile, JC Penney extended Bukta's

leave and ultimately, on October 21, 2001, sent her a letter terminating her employment. (Plaintiff's Exhibits at exhibit 29).

The EEOC issued Bukta a right to sue letter on February 12, 2002, and on March 3, 2002 Bukta filed a First Amended Complaint in the Court of Common Pleas, Trumbull County, Ohio. The First Amended Complaint alleged twelve claims for relief: (1) workers' compensation appeal; (2) negligence; (3) negligent infliction of emotional distress; (4) violations of the Family Medical Leave Act; (5) violations of the Americans with Disabilities Act and Ohio handicap discrimination law; (6) violations of the Age Discrimination in Employment Act; (7) violations of Title VII and Ohio sex discrimination law; (8) tort of wrongful discharge in violation of public policy; (9) retaliation for assertion of rights under the aforesaid statutes; (10) negligent infliction of emotional distress; (11) intentional infliction of emotional distress; and (12) loss of consortium.

Defendants [3] removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. (Dkt.# 1). The Court remanded count 1, the workers compensation claim asserted against the Defendant James Conrad to Trumbull County Court of Common Pleas on May 15, 2002. (Dkt.# 16). Bukta later dismissed her husband, Anthony Bukta, as a party. (Dkt.# 68). In addition, Bukta voluntarily dismissed counts 3, 6, 7, 10, 12, and 9 (in so far as they related to sex and age discrimination). (Dkt.# 68). Subsequently, on July 22, 2004 Defendant, Robert Karlowicz, was voluntarily dismissed as a party. (Dkt.# 119). The remaining causes of action are asserted against all Defendants and arise under violations of the Family

---

**3.** The Court shall refer collectively to the defendants as "Defendants" or "JC Penney" unless otherwise noted.

Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") (counts 4 and 9); violations of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") and violations of Ohio Revised Code, Section 4112 (counts 5 and 9); claims for negligence (count 2); a claim of tortious violation of public policy (count 8); and a claim of intentional infliction of emotional distress (count 11). On May 3, 2004, the instant motion ensued. (Dkt.# 69).

## II. STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering such a motion, the court must review all of the evidence in the record. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge .... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 556–57 n. 7 (6th Cir.2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)). The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Clayton v. Meijer, Inc.,* 281 F.3d 605, 609 (6th Cir.2002) (quoting *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548). The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. LAW AND ANALYSIS

### A. The Family and Medical Leave Act

Defendants seek summary judgment on Bukta's claim arising under the Family

Medical Leave Act ("FMLA"). The FMLA entitles an eligible employee [4] to as many as twelve weeks of unpaid leave in any twelve-month period...because of "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee seeking to use FMLA leave must provide her employer with notice and a qualifying reason for taking the leave.[5] *See* 29 U.S.C. § 2612(e)(2); *see also Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). The employee, however, need not specifically mention the FMLA when taking leave. *See Brohm*, 149 F.3d at 523 ( "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.") (internal quotation and citation omitted); *see also* 29 C.F.R. §§ 825.302(c), .303(b).

The statute expressly defines a "serious health condition" as an "illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "Continuing treatment" includes, *inter alia:*

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114(a)(2)(i); *see also* 29 C.F.R. § 825.800.

There are two distinct theories for recovery on FMLA claims. *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir.2003). The "entitlement" or "interference" theory pertains to the FMLA's creation of substantive rights. If an em-

---

**4.** The FMLA expressly incorporates into its provisions the Fair Labor Standards Act's ("FLSA"), 29 U.S.C. §§ 201–219 (1994), definition of "employee." *See* 29 U.S.C. § 2611(3) ("The terms 'employ,' 'employee,' and 'State' have the same meanings given such terms in subsections (c), (e), and (g) of section 203 of this title [the FLSA]."). The FLSA defines employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "eligible employee" under the FMLA is an "employee" who "has been employed for at least 12 months by the employer with respect to whom leave is requested ...; and for at least 1,250 hours of service with such employer during the previous 12–month period." 29 U.S.C. § 2611(2)(A).

**5.** When the need to take leave because of a serious health condition is foreseeable, an employee generally must provide the employer with thirty days notice prior to taking such leave. *See* 29 U.S.C. § 2612(e)(2)(B); *see also* 29 C.F.R. § 825.302(a). In all other instances (i.e., the need for leave is unforeseeable), an employee generally must provide notice to the employer "as soon as practicable." *See* 29 C.F.R. §§ 825.302(a)-(b), .303(a). " 'As soon as practicable' means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." 29 C.F.R. § 825.302(b); *see also* 29 C.F.R. § 825.303(a); *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713 (6th Cir.2003).

ployer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *See* 29 U.S.C. §§ 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."); 2614(a)(1) ("[A]ny eligible employee who takes leave...shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position.").

The "retaliation" or "discrimination" theory arises from 29 U.S.C. § 2615(a)(2), which provides that "it shall be unlawful for any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by this title." 29 U.S.C. § 2615(a)(2). Specifically, under the "retaliation" theory of recovery, "an employer is prohibited from discriminating against employees...who have used FMLA leave," nor can an employer "use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

Bukta's First Amended Complaint alleges both an "interference" and a "retaliation" claim.

### 1. "Interference" Claim

Under the "interference" theory, Bukta contends that Defendants violated the FMLA by (1) failing to accord her proper notice of her rights under the FMLA; and (2) denying her intermittent leave on September 1, 2000. *See* 29 U.S.C. §§ 2615(a)(1). Bukta asks that the Court "nullify, through its equitable powers, any FMLA charge against [ ] Bukta during the period March 13, 2000 through July 10, 2000." (Dkt. # 97 at 41).

From January 18, 2000 to September 1, 2000, Bukta received a total of 20 weeks paid leave under JC Penney's Illness Recovery Time ("IRT") Plan—8 weeks full time leave between January 18 and March 13, and 12 weeks intermittent leave between March 13 and September 1. (Plaintiff's Exhibits at exhibit 72). JC Penney policy requires that any IRT leave taken on account of an employees's own serious health condition be integrated with and counted against FMLA leave entitlement. (Plaintiff's Exhibits at exhibit 74).

The Code of Federal Regulations permits employers to designate that paid leave be counted against an employee's twelve week entitlement under the FMLA, *see* 29 C.F.R. 825.208(a)(2); however, the employer must notify the employee within two business days that the paid leave will count against FMLA leave. 29 C.F.R. 825.208(b)(1). Thus, "although an employer has the option of requiring an employee to designate vacation or other leave as FMLA leave, that option is waived if the employer fails to give proper notice of its intentions." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 300 (4th Cir.1998); 29 C.F.R. § 825.700(a) ("If an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement.").

The U.S. Supreme Court, however, has significantly constrained, if not completely invalidated, the application of these regulations. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 88, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). In *Ragsdale*, the Supreme Court held that an employer's technical failure to designate leave as FMLA leave did not prejudice an employee who, because of medical restrictions, would have had to take the medical leave whether she qualified under the FMLA or not. *Id.* at

90, 122 S.Ct. 1155; *see also Donahoo v. Master Data Center,* 282 F.Supp.2d 540, 555 (E.D.Mich.2003) ("Even though *Ragsdale* expressly invalidated only § 825.700(a), that regulation's notice provisions are almost identical to those in § 825.208, and its reasoning and holding...should apply equally to Plaintiff's argument here."); *Roberson v. Cendant Travel Svcs., Inc.,* 252 F.Supp.2d 573, 579–80 (M.D.Tenn.2002) (finding that an employer's failure to properly notify an employee that it would count her paid vacation time against her FMLA leave did not prejudice the employee where the employee's doctor had not released her to work until well after the twelve week period).

■ A similar conclusion applies to the instant case. Bukta, under the IRT Plan, received more than the required 12 weeks of FMLA leave.[6] During and after her 20 weeks of IRT leave, Bukta remained under a doctor's order not to work a full time schedule. Thus, Bukta could not have returned to work full time during her intermittent IRT leave. Consequently, she suffered no prejudice from JC Penney's technical failure to designate the leave as FMLA-qualifying.

■ Bukta also asserts that JC Penney violated the FMLA by not giving her intermittent leave after September 1, 2000. The above analysis demonstrates that Bukta was not prejudiced by Defendants' failure to notify her that her IRT Plan leave counted as FMLA leave, therefore her FMLA leave had expired by September 1, 2000. Furthermore, FMLA regulations provide that

> [i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to

restoration to another position under the FMLA. *However, the employer's obligations may be governed by the Americans with Disabilities Act (ADA).*

29 C.F.R. § 825.214(b) (emphasis added). On September 1, 2000 Bukta was unable to perform a full time work schedule; therefore she had no right to restoration under the FMLA.

### 2. *"Retaliation" Claim*

■ Bukta alleges in her First Amended Complaint that the Defendants "conspiratorially retaliated" against her because of her attempts to assert her rights under the FMLA. (First Amended Complaint at ¶¶ 104–11). " '[T]o succeed on a retaliation claim, an employee must demonstrate that [her] employer intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right.' " *Spurlock v. Peterbilt Motors Co. Inc.,* 58 Fed.Appx. 630, 631 (6th Cir.2003) (quoting *Strickland v. Water Works & Sewer Bd.,* 239 F.3d 1199, 1207 (11th Cir.2001) (citing *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999))). Bukta presents her retaliation claim as a catch-all provision of her First Amended Complaint. Bukta avers in her First Amended Complaint that she "was desperately asserting her legal rights" under the FMLA, ADA, ADEA, Title VII, state unemployment compensation laws, state workers' compensation laws, her employment contract, and other statutory common law and contractual rights. (First Amended Complaint ¶ 105). She further avers that "[u]pon information and belief, defendants jointly and severally and conspiratorially retaliated against her because of her attempts to assert her rights as aforesaid." (First Amended Complaint ¶ 106). Beyond this catch-all assertion of a retaliation claim in her First

---

**6.** Indeed, Bukta remained on leave and employed by JC Penney until October 2001.

Amended Complaint, Bukta fails to articulate in her further submissions to the Court precisely what FMLA rights she exercised and what adverse employment action was taken against her in relation to an exercised FMLA right.[7] Such bald assertions fail to support a cognizable claim under the FMLA. Accordingly, Bukta fails to assert a claim of retaliation under the FMLA.

## B. Disability Discrimination

Defendants further seek summary judgment on Plaintiff's disability claims arising under the Americans with Disabilities Act ("ADA") and Ohio handicap discrimination law, O.R.C. § 4112.02, and argue that Bukta's evidence fails to establish a prima facie case.

With the exception of the law of supervisory liability, discussed below, Ohio courts analyze state employment discrimination claims advanced under O.R.C. § 4112.02 pursuant to the framework established for federal employment discrimination claims. *See Myers v. Goodwill Indus. of Akron*, 122 Ohio App.3d 294, 701 N.E.2d 738 (Ohio App. 9 Dist.1997) (explaining that "[f]ederal case law interpreting Title VII is generally applicable to cases of alleged violations of R.C. Chapter 4112") (citing *Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm'n*, 61 Ohio St.3d 607, 575 N.E.2d 1164 (Ohio 1991)). Consequently, "the essential elements of an ADA claim and a claim under the Ohio handicap discrimination statute are identical." *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 452 n. 4 (6th Cir.2004) (citing *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938–39 (6th Cir.2000); *Hoffman v. Fidelity Brokerage Servs., Inc.*, 959 F.Supp. 452, 457 n. 1 (S.D.Ohio 1997)). Therefore, with the exception of issues regarding supervisory liability, the Court applies an analysis to Bukta's ADA claim identical to analysis of her Ohio handicap discrimination claim.

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a prima facie case of disability discrimination under the ADA "a plaintiff must show that: (1)[s]he is an individual with a disability; (2)[s]he is 'otherwise qualified' to perform the job requirements, with or without reasonable accommodation; and (3)[s]he was discharged solely by reason of his handicap." *Monette v. EDS Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996); *see also Hedrick*, 355 F.3d at 452; *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846, n. 2 (6th Cir.1995).

■ The specific method of proof which applies under the foregoing framework will vary depending upon the type of ADA case involved, specifically whether the plaintiff presents direct or indirect evidence of discrimination. *Monette*, 90 F.3d at 1182–85; *Burns v. City of Columbus*, 91 F.3d 836, 841–43 (6th Cir.1996) (analyzing the issue under the Rehabilitation Act, 29 U.S.C. § 794). Direct evidence is evidence that demonstrates a disability was the sole reason for an adverse employment action. *Hedrick*, 355 F.3d at 455. Bukta alleges that JC Penney based its refusal to afford her a part time schedule on the fact that she was unable to provide JC Penney with a complete medical release from her treating physician. Thus, in as much as Defen-

---

7. As discussed infra, Bukta does attempt to set out facts alleging a claim of retaliation under the ADA (Dkt. # 97, at 34–35).

dants relied on a physician's evaluation in making their decision to keep Bukta on leave and ultimately discharge her, Bukta successfully presents direct evidence that Defendants relied solely on her alleged disability in taking such adverse employment actions. *Id.* Bukta, accordingly, presents direct evidence of discrimination.

In cases where the plaintiff presents direct evidence of disability discrimination:

(1) The plaintiff bears the burden of establishing that he or she is disabled.

(2) The plaintiff bears the burden of establishing that he or she is otherwise qualified for the position despite his or her disability:

(a) without accommodation from the employer;

(b) with an alleged "essential" job requirement eliminated; or

(c) with a proposed reasonable accommodation.

(3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Hedrick,* 355 F.3d at 452 (citing *Monette,* 90 F.3d at 1186).

### 1. Whether the Plaintiff is Disabled

Bukta first bears the burden of establishing that she is disabled. *Id.* The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Toyota Motor Mfg., Kentucky,*

*Inc. v. Williams,* 534 U.S. 184, 193, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Bukta argues that her claim falls under all subsections of the definition.

In determining whether a person is disabled under subsection (A), a court considers three factors: "(1) whether the disease constitutes a physical [or mental] impairment; (2) whether the life activity purportedly curtailed as a result of the physical impairment constitutes a major life activity under the ADA; and (3) whether the physical impairment substantially limits this major life activity." *Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 780 (1998) (citing *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

#### a. Impairment

Bukta's physician has diagnosed her with conversion disorder, a psychiatric disorder that causes Bukta to suffer from anxiety attacks and physical symptoms of severe headaches, eye pain, blurred vision, shortness of breath, and chest pain. (Bukta Dep. at 79; Bukta Affidavit at ¶ 23). A physical or mental impairment means "any mental or psychological disorder..." or "any physiological disorder, or condition...affecting[, among others,] the following body systems: neurological, musculoskeletal, special sense organs, respiratory,...cardiovascular...." 29 C.F.R. § 1630.2(h).[8]

The Court is aware of no cases treating conversion disorder as an impairment under the ADA. Nevertheless, several social security cases have dealt with conversion disorder and instructed administrative law judges to analyze it as a mental impairment. *See Dykstra v. Barnhart,* 94 Fed.

---

**8.** The ADA defines neither "physical or mental impairment," "major life activities," nor "substantially limits," however the regula-

tions promulgated by the EEOC under the ADA provide significant guidance.

Appx. 449, 450 (9th Cir.2004) (finding evidence of conversion disorder constituted a colorable claim of mental impairment); *Matos v. Barnhart,* No. 03–4145–RDR, 2004 WL 1846136, *5–*6 (D.Kan. Jun.3, 2004) (finding that conversion disorder must be analyzed as a mental impairment); *see also Walters v. Barnhart,* 184 F.Supp.2d 1178, 1184–85 (M.D.Ala.2001) (analyzing conversion disorder as a mental impairment); *Crain v. Callahan,* 996 F.Supp. 1003, 1011–12 (D.Or.1997) (analyzing conversion disorder as a mental impairment).

Moreover, Bukta's conversion disorder manifests itself through the symptoms of eye pain, shortness of breath, and chest pains. It is well established that such symptoms constitute an impairment. *See* 29 C.F.R. § 1630.2(h)(1). Thus, reviewing the submitted facts in a light most favorable to Bukta, the psychiatric impairment of conversion disorder is a mental disorder and impairs her sight, respiratory and cardiovascular functions. Accordingly, Bukta's condition is an impairment for purposes of the ADA.

### b. Substantially Limits a Major Life Activity

Bukta must demonstrate that her mental impairment substantially limits her in a major life activity. *Cehrs,* 155 F.3d at 780. A "major life activity" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The regulations provide additional factors to consider in determining whether a person is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

■ Bukta identifies breathing and cardiovascular function as major life activities impaired by her condition [9] and alleges she is adversely affected by her symptoms in a way in which the average person in the general population is not affected. (Dkt. # 97 at 16; Bukta Affidavit at ¶ 40). Breathing is a major life activity for purposes of the ADA, 29 C.F.R. § 1630.2(i), because it is an activity "of central importance to daily life." *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). Cardiovascular function is likewise an activity "of central importance to daily life," and for purposes of the ADA is, thus, a major life activity as well. *Id.* Bukta asserts these major life activities are substantially limited when she experiences anxiety attacks.[10]

---

9. Bukta does not specifically plead a limitation to a major life activity in her First Amended Complaint. (¶ 68–80). In her Memorandum in Opposition to Summary Judgment, Bukta identifies breathing and cardiovascular function as well as seeing, blood pressure and thought processes as the major life activities limited by her impairment. (Dkt. # 97 at 16) Bukta does not identify working as a major life activity limited by her impairment, therefore, the Court shall not consider whether Bukta is substantially limited in the major life activity of working.

10. In so far as analysis of the major life activity of cardiovascular function concerns chest pains related to the breathing difficulty experienced by Bukta during an anxiety attack, the Court shall analyze cardiovascular

Where a plaintiff's impairment limits the major life activity of breathing, a plaintiff must present evidence such that a reasonable jury could find that her impairment significantly restricted the condition or manner of her breathing, as compared to the average person in the population. *Sebest v. Campbell City School Dist. Bd. of Education,* 94 Fed.Appx. 320, 325–26 (6th Cir.2004); *see Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719 (6th Cir.2000) (finding a genuine issue of material fact existed as to whether plaintiff was substantially limited in the major life activities of *breathing,* moving and performing manual tasks where her condition forced her to cease for a time performing daily activities because of the pain).

Analysis of the substantially limiting effect of a breathing impairment focuses on the severity and the frequency of the impairment. *See Muller v. Costello,* 187 F.3d 298, 313–14 (2nd Cir.1999) (finding plaintiff's breathing problems due to second-hand smoke exposure at work not substantially limited because plaintiff engaged in substantial physical activity outside work without breathing problems); *Zirpel v. Toshiba Am. Info. Sys., Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (finding plaintiff's panic attacks, although they hampered breathing did not substantially limit breathing because the attacks were infrequent and very manageable); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 37 (5th Cir.1996) (finding plaintiff's breathing not substantially limited because "[s]everal instances of shortness of breath when climbing stairs do not rise to the level of substantially limiting the major life activity of breathing"); *see also White v. Honda of America Mfg., Inc.,* 241 F.Supp.2d 852 (S.D.Ohio 2003) (finding plaintiff's breathing not substantially limited because plaintiff only had difficulty breathing when exposed to certain irritants and that exposure resulted only in brief symptoms); *Minnix v. City of Chillicothe,* No. 98–4285, 2000 WL 191828, at *2 (6th Cir. Feb.10, 2000) (finding plaintiff's breathing not substantially limited as there was no medical evidence that plaintiff's breathing problems were "severe, long term, or permanent"); *Ventura v. City of Independence,* No. 95–3582, 1997 WL 94688, at *2 (6th Cir. Mar.4, 1997) (finding plaintiff's breathing not substantially limited where plaintiff's asthma caused him difficulty but did not prevent him from engaging in activities such as walking or playing baseball).

Bukta experiences, as a result of her conversion disorder, anxiety attacks which cause her to suffer shortness of breath, as well as chest pain and blurred vision. The Sixth Circuit in *Sebest* considered a plaintiff who also experienced difficulty breathing as the result of anxiety attacks. *Sebest,* 94 Fed.Appx. at 325. There, the plaintiff's anxiety attacks occurred "when he [was] under stress or engaged in strenuous activity." *Id.* The Sixth Circuit found that the plaintiff was not substantially limited in the major life activity of breathing because he was only affected on "bad days" and the record did not reflect how often plaintiff had a bad day or the duration of such a period. *Id.* at 326. Bukta does not assert she suffers from bad days; rather, she asserts that her anxiety attacks, when they occur, debilitate her daily—to the extent that she must *gradually* assume a full time work schedule. As a result of her conversion disorder, Bukta, while working part time, experienced chest pains on a daily basis in the early morning and afternoon hours. (Bukta Dep. at 125). If her chest pains became extreme she was instructed by her physician to go home, and she did so on

function under the same legal standards ap-

plied to the major life activity of breathing.

one occasion. (Bukta Dep. at 125–26). *Cf. U–Haul Co. of Cleveland v. Kunkle,* 165 F.3d 29 (6th Cir.1998) (finding the major life activity of breathing substantially limited where Plaintiff had to leave work to retrieve an oxygen supply).

The Sixth Circuit in *Sebest* also found that the plaintiff could not produce evidence that his breathing became significantly restricted when not under stress or performing a strenuous activity. *Sebest,* 94 Fed.Appx at 326. Bukta's symptoms on the other hand manifest themselves at various times during the day as well as during stressful situations. (Shearer Affidavit at ¶ 21; Lucot Affidavit at ¶ 6). "Mere thoughts of stressful situations can cause [Bukta] to have heart palpitations and debilitating chest pains." (Lucot Affidavit at ¶ 6). Furthermore, Bukta experienced anxiety and physical symptoms outside of work and in other aspects of her life, particularly in the first few months. (Shearer Affidavit at ¶ 8). Bukta "even had headaches and other symptoms occur on a vacation" and "found [her]self unable to participate in practically anything during that [vacation] because [she] felt debilitated with chest pain, headaches, eyelid ptosis and blurry vision". (Bukta Affidavit at ¶ 25). She "still experiences[s] the symptoms in all sorts of situations that invoke stress, including at work, home and recreation." (Bukta Affidavit at ¶ 41).

██ Defendants argue, however, that Bukta's impairment is correctable and therefore is not "an impairment that presently 'substantially limits' a major life activity." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482–83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Any measures Bukta is taking to correct or mitigate her conversion disorder must be taken into account when judging whether she is substantially limited in the major life activities of breathing and cardiovascular function. *Id.*

An impairment which can be remedied or cured is not substantially limiting. *Roush v. Weastec, Inc.,* 96 F.3d 840, 844 (6th Cir.1996) (finding that an impairment that would be remedied by a kidney transplant failed to qualify as a disability for ADA purposes).

The Sixth Circuit has distinguished aliments which can be remedied from ailments which are chronic. *Id.* at 844 (distinguishing a kidney condition remedied by a transplant from a chronic condition of bladder inflammation). In *Roush,* a plaintiff's chronic bladder inflamation occasionally caused severe bladder infections and the Sixth Circuit found that the "bladder infections, though intermittent and temporary, are a characteristic manifestation of this physical impairment and thus are a part of the underlying impairment." *Id.* In a subsequent case, the Sixth Circuit expounded on this reasoning to find "a case of psoriasis [ ] a physical impairment because of the ongoing nature of the disease and its physiological impact even during its dormant stage." *Cehrs,* 155 F.3d at 780 (citing *Van de Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995) ("[A]n intermittent impairment that is a characteristic manifestation of an admitted disability is . . . a part of the underlying disability and hence a condition that the employer must reasonably accommodate.")).

Bukta's physician states that her conversion disorder may last the rest of Bukta's life (Shearer Affidavit at ¶ 5) and presents an "indefinite situation that could manifest itself at any time." (Shearer Affidavit at ¶ 21). Her condition may be managed through medication and relaxation techniques, but it cannot be cured. (Shearer Affidavit at ¶ 21–22). Evidence presented by Bukta indicates she is attempting to manage her condition through medication and relaxation techniques. (Shearer Affi-

davit at ¶ 21). Her physician has stated, however, that "drugs can often control her onsets but there are times when not even drugs control," and that he has "seen this occur with [Bukta] a number of times despite her numerous medications." (Id.). The record indicates that Bukta's condition of conversion disorder is ongoing and she remains subject to anxiety attacks; thus, her condition is capable of causing intermittent physically impairing symptoms. *See Cehrs*, 155 F.3d at 780. Considering the statements of her treating physicians, the Court finds that Bukta has presented sufficient evidence to demonstrate that she is presently "substantially limited" in these major life activities of breathing and cardiovascular function.

Accordingly, because Bukta has demonstrated that she suffers from an impairment that substantially limits a major life activity, she has met her prima facie burden of establishing she has a disability.

### 2. *Whether the Plaintiff is Otherwise Qualified*

Bukta next bears the burden of establishing the second prong of her prima facie case—that she is otherwise qualified for the position despite her disability. *Monette*, 90 F.3d at 1186. Bukta asserts that she is otherwise qualified with the reasonable accommodation of a temporary, part time schedule. Her proposed accommodation is to work four hours a day, have her hours gradually increased and ultimately resume a full time schedule.

 "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.' " *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633–34 (6th Cir.1998) (quoting *Monette*, 90 F.3d at 1183). An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship. *Id.* at 634; *Monette*, 90 F.3d at 1184.[11]

 "The employee's initial burden of articulating a reasonable accommodation need not be onerous. For the purposes of a prima facie showing, the plaintiff must merely 'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.' " *Cehrs*, 155 F.3d at 781 (quoting *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir.1995)).

Temporary, medical leave can be a reasonable accommodation. In *Cehrs* the Sixth Circuit held that an employee's request for a definite, relatively short leave—12 weeks—accompanied by a reasonable prospect of recovery was a reasonable accommodation and that plaintiff was otherwise qualified for the position at issue. *Id.* at 781–83. The Sixth Circuit later distinguished its holding in *Cehrs*, finding that where an employee could present only "a vague estimate" of his return date—placing it at one to three years in the future—such a request was not a reasonable accommodation. *Walsh v. United Parcel Service*, 201 F.3d 718, 727 (6th Cir.2000). The employee in *Walsh*

---

**11.** "Whether a requested accommodation is reasonable and whether it unduly burdens the employer are separate inquiries. *See Monette*, 90 F.3d at 1183, 1184 n. 10 and 1187. The *Monette* Court did acknowledge that the inquiry into undue burden and reasonableness are similar. The Court distinguished them on the grounds that the inquiry into reasonableness requires 'a factual determination untethered to the defendant employer's particularized situation,' whereas the question of whether a reasonable accommodation imposes an undue burden is evaluated with regard to 'the employer's specific situation.' " *Id.* at 1184 n. 10; *Walsh*, 201 F.3d at 726 n. 3 (internal citations omitted).

was on leave for a year and a half. *Id.* He requested as an accommodation an extension of that leave for purposes of getting a medical evaluation, but failed to provide his employer with an expected date of return. *Id.* The Sixth Circuit found that the employee's requested accommodation provided no reasonable prospect of allowing him to work in the future and was thus objectively unreasonable. *Id.* The Sixth Circuit then held that "when [ ] an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." *Id.*

■ The record before the Court presents a situation in between the facts of *Cehrs* and *Walsh.* The record demonstrates that the leave requested by Bukta was substantial. Bukta, by September 2000, had accrued two months of full time and three months of intermittent leave. As of September 2000, an accommodation would have required one more month of part time leave; thus, Bukta's request for an accommodation required a substantial leave of at least five months. On the other hand, the record also demonstrates that Bukta provided JC Penney with expected dates of return. In September of 2000, Bukta's JC Penney supervisors relieved her of her part time schedule until she could return to work full time, notwithstanding her doctor's recommendation that she not resume a full time schedule until October 18, 2000. After her meeting with JC Penney management in September 2000, Bukta experienced aggravation of her physical symptoms, and her doctor recommended, provided she was able to work part time, a renewed full time return date of November 1, 2000. Finally, a difference of interpretation exists as to Bukta's prospects for returning to work. Bukta interprets letters sent by her physicians to JC Penney as fully releasing her to assume full time work. Defendants interpret these exact same letters as not constituting a full release. (Plaintiff's Exhibits at exhibit 88).

Because the facts presented demonstrate neither the short leave found objectively reasonable in *Cehrs* nor the indefinite leave with no reasonable prospect of return to work found unreasonable in *Walsh,* the Court is unable to determine as a matter of law that Bukta has failed to meet her burden of establishing that she is otherwise qualified with a reasonable accommodation.

The Courts analysis, however, must continue. Even if Bukta's proposed accommodation is objectively reasonable, such accommodation may, however, impose an undue burden upon the employer.

### 3. Whether the Defendants Suffered an Undue Hardship

■ As a genuine issue of material fact exists as to whether Bukta is otherwise qualified to perform her position with a reasonable accommodation, JC Penney, next bears the burden "of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Hedrick,* 355 F.3d at 452 (citing *Monette,* 90 F.3d at 1186). "An employer need not make a reasonable accommodation if the employer 'can demonstrate that the accommodation would impose an undue hardship on the operation of its business.'" *Cleveland v. Federal Express Corp.,* 83 Fed. Appx. 74 (6th Cir.2003) (quoting 29 C.F.R. § 1630.9(a)); *see Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046 (6th Cir. 1998).

When considering undue hardship the ADA requires courts to consider the following factors: "(i) the nature and cost of

the accommodation needed under [the ADA]; (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity." 42 U.S.C. § 12111(10)(B).

JC Penney challenges Bukta's proposed accommodation, arguing that a part time schedule imposes an undue hardship on its business by eliminating the essential job requirement of attendance. Essential function means the fundamental duties of the position. 29 C.F.R. § 1630.2(n)(1). Attendance can be an essential job function. *See Brenneman v. MedCentral Health System,* 366 F.3d 412 (6th Cir.2004) (holding that attendance can be an essential function of a position and that excessive absenteeism rendered an employee unqualified for such a position); *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1047 (6th Cir.1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA."). Nevertheless, the Sixth Circuit has stated that "no presumption should exist that uninterrupted attendance is an essential job requirement, and . . . that a

medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." *Cehrs,* 155 F.3d at 780.

Bukta's accommodation does not seek to completely eliminate the essential function of full time attendance, rather she requests an accommodation that will temporarily eliminate full time attendance—a temporary part time schedule.[12] Thus, in this instance, it is not enough that JC Penney assert attendance as an essential job function, it must also demonstrate how Bukta's lack of attendance in the form of a temporary part time schedule imposes an undue hardship on its business.

Defendants have presented facts demonstrating that Bukta's part time schedule is a hardship to JC Penney's business. For instance, Bukta's SDM position in the Men's Division is a full time position requiring a work schedule of 40 hours a week, including some night and weekend work. (Bukta Dep. at 34). During the six months JC Penney allowed Bukta to work a part time schedule, tasks belonging to Bukta had to be reassigned to other employees. (Rustin Dep. at 54). Those employees had to pick up Bukta's workload while still completing their own work and not getting extra pay. (Id.). Defendants allege that this atmosphere contributed to low morale in the store and to a decline in sales volume as well. (Id.; Wenowitz Dep. Exhibit 40). Defendants further assert that the approaching holiday season put more stress on the employees covering for Bukta. (Wenowitz Dep. at 208).

 Despite the presentation of these facts, other facts presented to the Court

---

**12.** *See Sanders v. FirstEnergy Corp.,* 157 Ohio App.3d 826, 813 N.E.2d 932, 934 and 940 (Ohio App. 7 Dist.2004) (finding overtime attendance an essential function, but factually implying elimination of the overtime requirement was reasonable where such accommo-

dation was temporary). *See also Gantt,* 143 F.3d at 1047 (finding employee could not meet full time attendance requirement where employee gave no indication as to when she could return to work);

create a genuine issue of material fact as to whether Bukta's accommodation of a temporary part time schedule would have imposed a hardship on JC Penney's business. The record demonstrates that JC Penney did not place a person in Bukta's position until February 2001. (Wenowitz Dep. at 208, 214–16). JC Penney took Bukta off the part time schedule for the asserted reason that it required a full time worker in that position, especially during the holiday season. Indeed, JC Penney's plan to inform Bukta of the inability to accommodate her part time schedule was moved from October 18—her expected full time return date—to September 1, 2000 specifically because of the anticipated holiday season. (Wenowitz Dep. at 208). JC Penney did not, however, replace Bukta before October 18 nor did JC Penney fill her position during any of the other months making up the holiday season. It appears from that record that from September 2000 to February 2001 JC Penney had no individual placed in Bukta's position, and that consequently JC Penney employees continued to be reassigned in order to pick up the workload. Defendants' subsequent failure to replace Bukta during and after the holiday season therefore, raises a genuine issue of material fact as to whether Bukta's accommodation was an undue hardship.

In summary, Bukta has alleged direct evidence of disability discrimination and has further demonstrated a prima facie element of her case—that she has a disability. There exists a genuine issue of material fact whether she can demonstrate her other prima facie element—whether she is otherwise qualified for the position of SDM with a reasonable accommodation and whether Defendants can demonstrate that the requested accommodation is an undue hardship. Accordingly, Defendants are not entitled to summary judgment on

Bukta's disability discrimination claims under the ADA and O.R.C. 4112.02.

### 4. Supervisor Liability

Bukta has sued Wenowitz, her JC Penney store manager, McCormick, her JC Penney district manager, Kenneth Karbowski, JC Penney's district human resources manager, and Rustin, a JC Penney a human resources director based in Plano, Texas, for discrimination in their individual capacities.

 Supervisor liability claims are not cognizable under the ADA. Supervisors, sued in their individual capacities, are not included within the statutory definition of "employer" under Title VII and its sister civil rights statutes such as the ADA. *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir.1997) (finding that Congress did not intend individuals to face liability under the definition of "employer" as set forth in Title VII and stating that Title VII, the ADEA and the ADA all defined "employer" similarly). Under Ohio law, however, "individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment," and "for purposes of [O.R.C.] Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of [O.R.C.] Chapter 4112." *Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782, 787–88 (1999).

 Defendants argue Bukta has failed to allege any facts regarding discriminatory conduct by these defendants in their individual capacities. Bukta has alleged that Wenowitz, McCormick, Karbowski and Rustin failed to reasonably accommodate her disability. The facts presented to the Court for purposes of summary judgment reveal that Wenowitz, McCormick, Karbowski and Rustin dis-

cussed Bukta's situation and collectively made the decision in September 2000 to remove Bukta from a part time schedule until she could present a full release from her physician for full time work. (Wenowitz Dep. at 161, 330; Karbowski Dep. at 48). *Cf. Jones v. Kilbourne Medical Laboratories,* 162 F.Supp.2d 813, 830 (finding a defendant could not be held individually liable under Ohio law because he was not the decision maker with respect to the plaintiff's termination).

Consequently, the evidence before the Court presents sufficient facts upon which a reasonable juror could conclude that the named individuals are supervisors [13] and that the named individuals made a decision resulting in an adverse, discriminatory employment action. *Accord Johnson v. The Kroger Company,* 319 F.3d 858, 868 (6th Cir.2003) (addressing the liability of participants in a decisionmaking process).

The Court finds that although the Plaintiff cannot assert supervisory liability claims against the Defendants under the ADA, the individual defendants in this case may be held personally liable for violations of the Ohio state handicap discrimination statute.

## C. ADA Retaliation

▮▮▮ Defendants seek summary judgment on Bukta's retaliation claim under the ADA.[14] Bukta's First Amended Complaint alleges JC Penney retaliated against her for her attempts to assert her rights under the ADA and O.R.C. § 4112.[15] The elements of a retaliation claim under the ADA are the same as those for a Title VII retaliation claim: (1) that plaintiff engages in an activity protected by the law; (2) that the exercise of the plaintiff's rights was known to the defendant; (3) that thereafter plaintiff was subject to an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Williams v. General Motors Corp.,* 187 F.3d 553, 568 (6th Cir.1999); *Penny v. United Parcel Service,* 128 F.3d 408, 417 (6th Cir.1997).

On or about March 26, 2001, Bukta engaged in the protected activity of filing an administrative charge with the Federal Equal Employment Opportunity Commission ("EEOC").[16] (First Amended Com-

---

**13.** In so far as Wenowitz, Karbowski, McCormick and Rustin had the authority to deny Bukta's requested accommodation and exercise of such authority was discriminatory, Wenowitz, Karbowski, McCormick and Rustin are supervisors under O.R.C. 4112.02. *See McCormick v. Kmart Distribution Center,* 163 F.Supp.2d 807, 823 (N.D.Ohio 2001) (finding that in order to determine whether an individual is liable under Ohio's discrimination statute, a Court must "look to the employer's authority misused by the employee-supervisor").

**14.** Bukta's First Amended Complaint asserted retaliation claims under the ADA, FMLA, ADEA, and Title VII. Bukta subsequently dismissed the counts of sex and age discrimination under Title VII and the ADEA (Dkt.# 68), and the Court has already found that Bukta fails to present a claim of retaliation under the FMLA. Therefore, the Court now consid-

ers the remaining retaliation claim, which lies under the ADA.

**15.** The burden for establishing a retaliation claim under O.R.C. § 4112 is identical to the burden for establishing retaliation under the federal employment laws. *Moorer v. Copley Tp.,* 98 F.Supp.2d 838, (N.D.Ohio 2000) (citing *Chandler v. Empire Chemical, Inc.,* 99 Ohio App.3d 396, 402, 650 N.E.2d 950 (Ohio App. 9 Dist.1994)).

**16.** Bukta in her Memorandum in Opposition designates "being disabled" as the protected activity in her retaliation claim. "Being disabled" is not a protected activity for purposes of an ADA retaliation claim. The ADA prohibits retaliatory conduct by an employer in two situations: (1) under the "participation clause," when an employee "has made a charge, testified, assisted, or participated in

plaint ¶ 35). The only adverse employment action—or "'materially adverse' change in the terms or conditions of her employment," *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir. 1996)—suffered by Bukta after March 26, 2001 was her discharge in October 2001.[17]

Defendants argue that Bukta cannot establish a causal connection between her filing of the EEOC charge in March 2001 and her discharge in October 2001. To establish a causal connection a plaintiff must produce sufficient evidence to infer that a defendant would not have taken the adverse employment action had the plaintiff not engaged in a protected activity. *Barrett v. Lucent Technologies, Inc.,* 36 Fed.Appx. 835, 841 (6th Cir.2002) (citing *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997); *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1068 (6th Cir.1990)). A causal connection may be shown by direct evidence or by the employer's knowledge of the protected activity coupled with a closeness in time sufficient to create an inference of causation. *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999).

Termination from employment is an adverse employment action. *DiCarlo v. Potter,* 358 F.3d 408, 420 (6th Cir.2004). Nevertheless, Bukta has failed to show that her termination was causally connected to a protected activity. Her termination occurred over six months after she filed her March 2001 charge with the EEOC. Temporal proximity alone, in the absence of other direct or compelling circumstantial evidence, is generally insufficient to support a finding of causal connection. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 566 (6th Cir.2000). Temporal proximity may establish a prima facie case only if the temporal proximity is "very close." *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *see Hafford,* 183 F.3d at 515 (finding that, absent additional evidence, two to five months was insufficient to create a triable issue of causation); *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (finding that four months was insufficient to support an inference of retaliation).

Bukta's First Amended Complaint alleges a temporal proximity between her filing of the EEOC charge and her termination. Further submissions by Bukta to the Court, however, fail to provide any direct or circumstantial evidence to support the causation element of her retaliation claim. The seven month time span between filing the charge and being discharged is too large to solely establish causation. Bukta, accordingly, fails to establish a prima facie case of retaliation under the ADA.

---

any manner in an investigation, proceeding, or hearing"; or (2) under the "opposition clause," when an employee has opposed a violation of the act. 42 U.S.C. § 12203; *see Booker v. Brown and Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989). The record before the Court reflects that Bukta has filed an EEOC charge, which is a protected activity falling under the "participation clause." Because the record before the Court clearly evidences a protected activity, the Court shall further consider Bukta's claim of retaliation.

**17.** In her Memorandum in Opposition to Summary Judgment, Bukta lists multiple incidents she asserts are adverse employment actions, however none of these incidents occurred after March 2001. (Dkt # 97 at 35). Furthermore, any failure by Defendants to accommodate Bukta after March 2001 is not an adverse employment action because JC Penney prior to and after March 2001 continued to refuse to accommodate her. Thus, refusals to accommodate after March 2001 did not represent materially adverse changes in the conditions of Bukta's employment situation. *See Kocsis,* 97 F.3d at 885.

## D. Negligence

 Defendants seek summary judgment on Bukta's negligence claim, arguing that it is preempted by her workers' compensation claims, since remanded to state court. (Dkt.# 16). An employer in compliance with Ohio's workers' compensation law generally is immune from liability for injuries received by an employee in the course of or arising out of his employment. O.R.C. § 4123.74; *see Blankenship v. Cincinnati Milacron Chemicals, Inc.,* 69 Ohio St.2d 608, 433 N.E.2d 572 (Ohio 1982). Nevertheless, this statutory grant of immunity applies only to causes of action arising from certain types of injury. *Bunger v. Lawson Co.,* 82 Ohio St.3d 463, 696 N.E.2d 1029, 1032 (Ohio 1998). It does not immunize employers from all negligence suits, "but instead makes them immune from common-law actions for any 'injury' suffered on the job." *Id.* Psychological injuries are not injuries included within the statutory definition of "injury" under Ohio law. *Id.* Bukta asserts that her injury is psychological. Accordingly, her injury "is not among the class of injuries from which employers are immune from suit." *Id.* Therefore, Ohio's workers' compensation statute does not preempt Bukta's negligence claim.

## E. Public Policy—Wrongful Discharge

 Defendants seek summary judgment on Bukta's claim of wrongful discharge in violation of public policy. In order to establish a claim for tortious violation of public policy a plaintiff must prove:

(1) a clear public policy manifested in a statute, regulation, or the common law;

(2) that discharging an employee under circumstances like those involved would jeopardize the policy;

(3) that the discharge at issue was motivated by conduct related to the policy; and

(4) that there was no overriding business justification for the discharge.

*Kulch v. Structural Fibers, Inc.,* 78 Ohio St.3d 134, 677 N.E.2d 308, 321–22 (Ohio 1997). Bukta's First Amended Complaint bases her public policy tort claims on her remaining statutory claims: the ADA, O.R.C. § 4112 and the FMLA[18]. (First Amended Complaint ¶ 99). The Court has found that Bukta has failed to establish a violation under the FMLA, thus Bukta's remaining and sole statutory basis for a public policy tort of wrongful discharge lies under the ADA and O.R.C. § 4112.02 for disability or handicap discrimination.

Decisions by the Ohio Supreme Court have raised the issue of whether a plaintiff can be barred from pursuing a tort of wrongful discharge in violation of public policy because the tort possibly duplicates the remedies of the alleged underlying statutory violation. *Bicudo v. Lexford Properties, Inc.,* 157 Ohio App.3d 509, 812 N.E.2d 315, 328–29 (Ohio App. 7 Dist.2004) (citing *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653 (Ohio 1995); *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 773 N.E.2d 526 (Ohio 2002)). In *Wiles,* the Ohio Supreme Court found that a plaintiff had no separate claim for the tort of wrongful discharge in violation of public policy when the tort was based solely on a claimed violation of the FMLA. *Id.* at 534.

Some Ohio appellate courts have interpreted the above cited cases to mean that a plaintiff cannot assert a claim of wrongful discharge in violation of public policy when the tort claim is based solely on a

18. Bukta's statutory claims under the ADEA and Title VII were dismissed. (Dkt.# 68).

violation of O.R.C. § 4112.02. *Berge v. Columbus Community Cable Access,* 136 Ohio App.3d 281, 736 N.E.2d 517 (Ohio App. 10 Dist.1999); *Barlowe v. AAAA International Driving School, Inc.* 2003 Ohio 5748, 2003 WL 22429543 (Ohio App. 2 Dist. Jun 15, 2004). *Cf. Gessner v. Union,* 2004 Ohio 5770, 2004 WL 2429802 (Ohio App. 2 Dist. Oct.8, 2004) (finding a public policy tort for wrongful discharge existed where plaintiff based the claim on violations of O.R.C. § 4112.02 for age discrimination *and* O.R.C. § 4112.14, the whistle blower statute). Nevertheless, absent further guidance from the Ohio Supreme Court, this Court is reluctant to follow the reasoning of these appellate decisions.

■ Unlike its decision regarding the FMLA, the Ohio Supreme Court has not yet held that the ADA and O.R.C. § 4112.02 provide remedies broad enough to fully compensate an aggrieved employee for an employer's violation of those statutes. Therefore, even though the ADA and O.R.C. § 4112.02 provide remedies for damages, injunctive and other appropriate relief, the Court shall recognize a common law action for wrongful discharge in violation of public policy under Ohio law based solely on violations of the ADA and O.R.C. § 4112.02.

Accordingly, Bukta, who has presented enough evidence to survive summary judgment on her individual disability claims,[19] may proceed on her claim of wrongful discharge in violation of public policy.

## F. Intentional Infliction of Emotional Distress

■ Defendants lastly seek summary judgment on Bukta's claim of intentional infliction of emotional distress. To establish the tort of intentional infliction of emotional distress in Ohio, a defendant's "conduct [must be] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (Ohio 1983). "The conduct must be more than mere insults, indignities, threats, annoyances, petty aggressions, or other trivialities." *Mason v. United States Fid. & Guar. Co.,* 69 Ohio App.3d 309, 590 N.E.2d 799, 804 (Ohio App. 1 Dist.1990) (internal citations omitted).

■ A plaintiff must establish the following elements in order to sustain a claim of intentional infliction of emotional distress under Ohio law:

**19.** In order to prevail on a tort of wrongful discharge in violation of public policy based in a violation of a discrimination statute, a plaintiff will likely have to first establish a violation of that underlying discrimination statute.

Many appellate districts have also held that a wrongful discharge claim based on a violation of R.C. 4112.02 must fail if the plaintiff does not establish a violation of R.C. 4112.02: *Vitatoe v. Lawrence Industries, Inc.,* 153 Ohio App.3d 609, 795 N.E.2d 125 (Ohio App. 8 Dist.2003) (finding that without proof of a violation of R.C. 4112.02, there is no proof that public policy has been violated); *Pflanz v. Cincinnati,* 149 Ohio App.3d 743, 778 N.E.2d 1073 (Ohio App. 1 Dist.2002) (finding wrongful-discharge claim fails because plaintiff was not in class of people protected by R.C. 4112.02); *Ferraro v. B.F. Goodrich Co.,* 149 Ohio App.3d 301, 777 N.E.2d 282 (Ohio App. 9 Dist. 2002) (finding employee who bases wrongful-termination claim on violation of R.C. 4112.02 must strictly comply with the statute); *Cochran v. Columbia Gas of Ohio, Inc.,* 138 Ohio App.3d 888, 742 N.E.2d 734 (Ohio App. 10 Dist.2000) (finding plaintiff did not identify any clear public policy other than R.C. 4112.02, and wrongful-discharge claim must fail if R.C. 4112.02 claim fails).

*Bicudo,* 812 N.E.2d at 329 (internal citations omitted).

(1) that defendants either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to the plaintiff;

(2) that defendants' conduct was extreme and outrageous;

(3) that defendants' actions were the proximate cause of plaintiff's psychic injury; and

(4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Pyle v. Pyle,* 11 Ohio App.3d 31, 34, 463 N.E.2d 98 (Ohio App. 8 Dist.1983).

▮ Even when the Court accepts as true all of Bukta's assertions concerning the Defendants' conduct, their behavior is not so extreme that it would cause an average member of the community to find it to be outrageous. Although the Defendants' conduct, even when considered cumulatively, may be considered inequitable, it does not fall outside the bounds of decency. *See Thatcher v. Goodwill Indus. of Akron,* 117 Ohio App.3d 525, 690 N.E.2d 1320 (Ohio App. 9 Dist.1997) (finding conduct of employer not sufficiently extreme to support a negligent infliction of emotional distress claim where employer spoke coarsely to the employee, and moved threateningly toward him during a meeting causing plaintiff to suffer a blackout). *Cf. Russ v. TRW, Inc.,* (1991), 59 Ohio St.3d 42, 570 N.E.2d 1076 (Ohio 1991) (finding conduct of employer sufficiently extreme to support an intentional infliction of emotional distress claim where the employer knowingly encouraged the employee to unwittingly break the law, then informed authorities of the employee's lawbreaking, causing threats of criminal prosecution against the employee and the employee's enlistment in collecting information undercover against his former colleagues).

Accordingly, Defendants are entitled to summary judgment on this count.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt.# 69) is **GRANTED** in part and **DENIED** in part. Defendants' are granted summary judgment on counts 4, 9, and 11 of the First Amended Complaint. Therefore, the Defendants are entitled to judgment on these counts. Plaintiff may proceed on the remaining counts 5, 2, and 8: her disability discrimination claims under the ADA and O.R.C. § 4112.02, her negligence claim, and her wrongful discharge claim.

**IT IS SO ORDERED.**